**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 92-1408
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CHARLES HARDIN MURPHY, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____
(July 13, 1993)

Before REAVLEY, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:

Charles Hardin Murphy, Jr., appeals his jury conviction of two counts of robbery of a financial institution in violation of 18 U.S.C. § 2113(a) and (d), and two counts of carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), and his sentence.  We affirm.

BACKGROUND

On September 26, 1991, a clean-shaven male entered the Southwest Savings Bank, Dallas, Texas, and demanded money at gunpoint from tellers Garrett and Alexander.  The robber absconded with $5,794.  Both Garrett and Alexander gave detailed descriptions of the robber.  Alexander also identified a .38 caliber pistol, which was recovered, approximately a month later, from a Mercury Sable automobile driven by Murphy, as either the same weapon or

identical to the one which was brandished at her during the robbery.

Darryl Neff, a bank customer, observed the robber leave the bank and enter a blue Honda. Later on the day of the robbery, the car was recovered a few blocks from the bank. Its ignition had been damaged so that it could be operated without a key. A Dallas Police Investigator testified that the damage to the ignition could have been accomplished with a dent puller.

On October 3, 1991, a clean-shaven male entered the United Savings Bank, Dallas, Texas, and approached one of the tellers. The man robbed the teller at gunpoint using a .38 caliber pistol. Teller Irvin, who was in the next teller's booth, gave a detailed description of the robber. She observed the robber leave the building and enter a tan car. Before he exited, she activated her surveillance camera. Some of the money taken during the second robbery contained an electronic tracking device concealed in a cutout of the center of some of the bills.

A light colored Honda was found approximately one block from the United Savings Bank shortly after the robbery. Its ignition had been altered in a manner similar to the blue Honda. On the same day as the first robbery, a red Honda was stolen from a location close to Southwest Savings Bank. It was found after the second robbery. The ignition had been removed in a manner similar to the other two cars. Found in the vehicle was a photograph given to Murphy by a friend, a beer can with Murphy's fingerprint on it, a tracker dollar bill with the center removed, and a bag containing

2

assorted screwdrivers, pliers, and a dent puller. None of the items were in the vehicle before its theft.

One month later, a police officer made a routine traffic stop of a Mercury Sable near Cap City, Texas. Murphy was driving and Randy Floyd was a front seat passenger. While the officer was performing a license and warrant check, Floyd drove the Sable away, leaving Murphy by the roadside. The officer pursued and overtook Floyd a short distance down the road. Murphy fled on foot but was located and arrested the next day. When inventoried, the Mercury Sable contained a rental agreement in Murphy's name, the earlier referenced .38 caliber short barrel revolver which matched the one used in both robberies, a police scanner with a book of police frequencies, a collection of tools, including a dent puller, a pair of sunglasses, and a bloody syringe located on the drivers side of the car.

Richard Crum, an FBI agent who specialized in firearms and tool mark identification, testified that the tool marks on the ignitions of the blue and tan Hondas could have been made with some of the tools found in the red Honda and/or the rented Sable.

Randy Floyd, who had known Murphy for ten or more years, identified him as the robber depicted in the surveillance photos. Floyd further testified that Murphy offered him $1,000 to rent a home for Murphy in Floyd's name. He also testified that Murphy instructed him to drive off in the Sable when the two men were stopped.

Murphy's mother testified that she last saw him on October 3,

1991, the day of the second robbery, but that he had stopped visiting her thereafter.

DISCUSSION

I.  Flight Instruction.  Murphy contends that the district court erred in submitting a flight instruction to the jury.  He alleges that there was no evidence that he knew that he was a bank robbery suspect, and the alleged flight occurred over a month after the second robbery.  Murphy does not challenge the jury instruction itself, but asserts only that the instruction was improper based on the evidence.

Evidence of an accused's flight is generally admissible as tending to establish guilt.  United States v. Williams, 775 F.2d 1295, 1300 (5th Cir. 1985), cert. denied, 475 U.S. 1089 (1986).  A flight instruction is proper when the evidence supports four inferences:  1) the defendant's conduct constituted flight; 2) the defendant's flight was the result of consciousness of guilt; 3) the defendant's guilt related to the crime with which he was charged; and, 4) the defendant felt guilty about the crime charged because he, in fact, committed the crime.  United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977), cert. denied, 439 U.S. 847 (1978).

Murphy's contention that the flight instruction was improper under Myers is unavailing.  Neither party disputes that Murphy's conduct constituted flight.  Additionally, the evidence is clear that, when he fled, Murphy was aware that he was a suspect in the bank robberies.  His mother testified that he stopped visiting her after the date of the second robbery.  FBI agents had visited his

4

mother, sister, and brother-in-law, between the second robbery and his flight and informed each of them that he was a suspect in the bank robberies. Murphy also asked Floyd to rent a house for him in Floyd's name in exchange for $1,000. Murphy instructed Floyd to drive off, leaving Murphy behind to effect his escape. Furthermore, after inventorying the Sable, a police scanner with a list of police frequencies was inventoried, indicating that Murphy was paying attention to police communications.

Additionally, nothing in the record indicates that Murphy fled out of fear of being arrested for another crime. Murphy asserts that when they were stopped, he and Floyd were injecting heroin, and that he fled because he was afraid of getting caught using drugs. As noted, a bloody syringe was found in the Sable. However, the officer who stopped the vehicle testified that it was a routine traffic stop and that Murphy passed a field sobriety test. In fact, Murphy instructed Floyd to drive off while the officer was running a routine check for warrants. Unlike Myers, the instant record does not indicate another crime from which Murphy could have been fleeing. Myers, 550 F.2d at 1050.

Murphy also asserts that his flight occurred over a month after the offense, and thus, he was not aware that he was a suspect at the time of his flight. In Myers, the alleged flight occurred three to six weeks after the commission of the charged offense. Id. However, Myers did not hold that a specific time interval between the crime and flight negates the defendant's awareness that he was a suspect. Id. at 1050-51. No Fifth Circuit precedent

5

supports this contention.  We conclude that, although a month had passed since the robberies, Murphy was fully aware at the time of his flight that he was a suspect.  The trial court's instruction was proper.

II.  <u>Prosecutorial Misconduct</u>.  Appellant contends that the prosecution engaged in misconduct during closing argument by commenting on defense counsel's failure to ask certain witnesses whether they believed that the bank surveillance photographs depicted Murphy.  He also argues that it was plain error for the prosecutor to state that he believed Murphy committed bank robberies other than those for which he was on trial.

A.  <u>Failure to Ask Specific Question</u>

Murphy contends that the prosecutor "impermissibly shifted the burden of proof when it commented on defense counsel's failure to ask certain witness[es] whether they believed the bank surveillance photographs depicted [him] when those witnesses were equally available to the prosecution."[1]  However, he cites no persuasive authority.

Counsel is accorded wide latitude during closing argument, and this court gives deference to a district court's determination regarding whether those arguments are prejudicial and/or inflammatory.  <u>United States v. Williams</u>, 822 F.2d 512, 518 (5th

---

[1]  In closing argument, defense counsel asked the jury to compare Murphy, as he looked in the courtroom, to bank surveillance pictures which the prosecutor claimed were of Murphy.  He argued that the prosecutor's witnesses who had identified Murphy during the trial should not be believed.  Defense counsel, however, did not ask Murphy's mother, sister, or brother-in-law to try and identify Murphy from the bank surveillance pictures.

6

Cir. 1987). The district court overruled defense counsel's objections to the prosecution's remarks. That determination is entitled to deference. Williams, 822 F.2d at 518. Further, defense counsel invited the response when he challenged the jury to compare Murphy, as he looked in the courtroom, to the photographs. He also stated that the photographs did not depict Murphy. The prosecution's remarks fall within the ambit of the wide latitude accorded counsel in closing argument. Id.

B.  Statements Allegedly Concerning Robberies

Murphy contends that the prosecution stated, in closing argument, that he committed bank robberies other than those for which he was on trial. He is mistaken.

During closing argument, the prosecution stated:

> Members of the jury, what you have here is, based on the evidence, is a smart robber. Yes, the first two witnesses, it was a painful experience. I think you can understand that. They came down here and they told you of course, they selected the photographs and you will have those things like Mr. Stickney said. Yes, they are in evidence. They told you that the appearance--I believe all the witnesses told you that the appearance of the Defendant had changed. Other witnesses told you, and it is established and we have the photographs to prove that, the appearance of the Defendant has changed and that is because the evidence shown him to be the smart robber. This isn't any bumbling, juvenile 7-11 robbery. This is a robbery, these are robberies that have been planned, you have to pick the time, the place. **There are obviously some more and I won't get into that.** You have seen for yourself. You have to pick the getaway car like on the 26th with that red Honda.

No objection was made to this statement. Thus, the standard of review is plain error. United States v. Okenfuss, 632 F.2d 483,

7

485 (5th Cir. 1980); Fed.R. Crim. P. 52(b).

Appellant asserts that the sentence "There are obviously some more and I won't get into that," should be construed as a statement by the prosecution that Murphy had committed other bank robberies. When the statement is taken in context, while perhaps ambiguous, it reasonably referred only to other factors which would demonstrate that the bank robberies had been well-planned.

Murphy relies on United States v. Labarbera, 581 F.2d 107, 109-10 (5th Cir. 1978), in which this Court reversed a conviction because the prosecution inferred to the jury that there was evidence of the defendant's guilt which it had been unable to present. Id. at 109-10. We also reversed based on improper impeachment evidence. Id. at 110. The record in the instant case does not yield the same result. There was no plain error.

III. Expert Testimony. Appellant contends that the district court improperly admitted expert testimony regarding tools and the marks on the ignitions. He asserts that FBI Agent Crum's opinion that the marks on the ignitions of the stolen cars may have been made by two of the screwdrivers found in the red Honda and the Mercury Sable was improper. Murphy argues that the mechanics who later removed the ignitions from the stolen cars testified that the ignitions had been removed by a chisel or screwdriver and that those tools may have made the marks on the ignitions as opposed to the tools associated with Murphy. He finally claims that the district court abused its discretion because the Government failed to establish that the marks on the ignitions were not made when

8

those ignitions were removed from the automobiles.

A trial court's decision to admit expert testimony over objection is reviewed for an abuse of discretion. <u>Salem v. United States Lines Co.</u>, 370 U.S. 31, 35 (1962).

Murphy first relies on Federal Rule of Evidence 703 and <u>Christophersen v. Allied-Signal Corp.</u>, 939 F.2d 1106, 1110-12 (5th Cir. 1991) (en banc), <u>cert. denied</u>, 112 S. Ct. 1280 (1992). Evidence that the marks may have been made during removal did not render unreliable the opinion that they may also have been made by Appellant. Each event was possible. Appellant has not shown that Crum's testimony was based on unreliable facts.

Additionally, the trial court instructed the jury, regarding the expert testimony, that it

> should consider each opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of an opinion are not sound, or that an opinion is outweighed by other evidence, then you may disregard the opinion entirely.

The district court exercised caution in its limiting instruction and did not abuse its discretion. Murphy has cited no authority sustaining his contention.

Murphy also contends that the expert testimony should have been excluded pursuant to Federal Rule of Evidence 403 because the probative value of the testimony was outweighed by its prejudicial impact when the Government failed to establish that the marks on the ignitions were not made when the ignitions were removed by the

mechanics. Once again, Murphy fails to cite any persuasive authority for his contention. Additionally, given the jury instruction permitting the jury to disregard an opinion it found unsound or unsupported, his contention has little merit. Agent Crum testified that the tools such as the screwdriver associated with Murphy "could" have made the marks on the ignitions but that he could not positively attribute the marks to the tools identified with Murphy. Crum did not specifically assert that the marks on the ignitions were made by the tools associated with Murphy, therefore one would be hard pressed to see how the testimony could be unfairly prejudicial or confusing.

For the foregoing reasons, the judgment is

AFFIRMED.[2]

---

[2] Murphy also challenged his sentence. However, he withdrew this issue at oral argument in light of the Supreme Court's affirmance of our opinion in United States v. Deal, 954 F.2d 262 (5th Cir. 1992), aff'd. 113 S.Ct. 1993 (1993).